IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

TRACY THOMAS,

      Plaintiff,

v.                                      Case No. 2:13-CV-2248-JTM

LOUISVILLE LADDER, INC. *et al*.,

      Defendants.

## MEMORANDUM AND ORDER

Plaintiff Tracy Thomas seeks monetary damages from defendant Louisville Ladder, Inc. ("defendant") for alleged negligence, manufacturing defect, failure to warn, design defect, and breach of implied warranty. This matter is before the court on defendant's Motion to Exclude and Strike Expert Testimony (Dkt. 49) and Motion for Partial Summary Judgment (Dkt. 51). For the reasons stated below, defendant's Motion for Partial Summary Judgment is granted. Defendant's Motion to Exclude and Strike is dismissed as moot.

### I.      Factual and Procedural Background

**A.     Local Rule Dispute**

As an initial matter, defendant alleges that plaintiff, in her Response to the motion for partial summary judgment, failed to comply with local rules 56.1(a) and 56.1(e). Dkt. 59, at 7. These rules read as follows:

> (a) **Supporting Memorandum**. The memorandum or brief in support of a motion for summary judgment must begin with a section that contains a concise statement of material facts as to which the movant contends no genuine issue

exists.  The facts must be numbered and must refer with particularity to those portions of the record upon which movant relies.  All material facts set forth in the statement of the movant will be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of the opposing party.

(e) **Duty to Fairly Meet the Substance of the Matter Asserted**.  If the responding party cannot truthfully admit or deny the factual matter asserted, the response must *specifically* set forth in detail the reasons why.  All responses must fairly meet the substance of the matter asserted.

D. KAN. R. 56.1 (emphasis added).  Defendant alleges that, of the thirty-three paragraphs of uncontroverted facts it set forth in its motion, plaintiff admitted only twelve.  Dkt. 59, at 7.  The remaining twenty-one paragraphs were not admitted, denied, or adequately addressed.  Dkt. 59, at 7.  As such, defendant argues, those remaining twenty-one facts should be deemed admitted for purposes of summary judgment.  Based on a review of the pleadings, the court agrees.

Kansas Rule 56.1(a) allows a material fact to be deemed admitted unless it was *specifically* controverted by the statement of the opposing party.  Any controverting statement must fairly meet the substance of the matter asserted.  D. KAN. R. 56.1(e).  However, for a majority of defendant's proffered facts, plaintiff seemingly disregarded these rules, opting instead to supplement, reword, or attempt to explain defendant's statement without ever admitting or denying the statement's content. For example, in paragraph number two, defendant sets forth the following: "[p]laintiff alleges that she suffered physical injuries to her wrist, knee, and heel and that she suffered severe traumatic head injury when the ladder collapsed while she was standing on it."  Dkt. 52, at 1.  In response, plaintiff only provides supplemental information, stating that she "also sustained extensive permanent, painful and disabling injuries, along with pain and suffering, disfigurement and emotional distress."  Dkt. 57, at 2.  In paragraph six, defendant proffers that "[p]laintiff alleges that the traumatic brain injury she suffered has impaired her ability to perform these services ([p]laintiff states that she believes her creative is

not as effective and she is losing business because of it.)." Dkt. 52, at 2. In response, plaintiff simply rewords the statement: "[a]s a result of [p]laintiff's psychological brain trauma, her creative ability was not as effective as it was before the incident and because of that, she was not introduced to new clients, resulting in lost income." Dkt. 57, at 3. Finally, in response to paragraph twelve (and numerous others), plaintiff attempts to simply explain away the allegation. Defendant states "[p]laintiff was never told by anyone (neither Direct Energy nor John Young) that Direct Energy chose not to hire her because of an impaired creative ability." Dkt. 52, at 3. Even though plaintiff admitted this fact in her deposition, her response reads as follows: "[p]laintiff fostered this belief because Direct Energy never called her back about retaining her services, nor did John Young, who was previously happy with [p]laintiff's work, invite [p]laintiff to pitch advertising for his new business." Dkt. 57, at 4.

Having reviewed and considered plaintiff's response to paragraphs 2, 3, 5, 6, 10-19, 21, 23, 25-27, 30, and 32 of defendant's statement of uncontroverted facts, the court finds that plaintiff failed to specifically controvert these facts as required by D. KAN. R. 56.1(a) and failed to fairly meet the substance of these paragraphs as required by D. KAN. R. 56.1(e). Therefore, these facts are deemed admitted for purposes of defendant's motion for partial summary judgment.

## B.    Factual and Procedural Background

This case arises from a July 22, 2010, incident during which plaintiff, age sixty-two (62), alleges that she was injured by an extension ladder manufactured by defendant's predecessor-in-interest, Cuprum. In 1992, plaintiff purchased a twenty-foot aluminum Cuprum model 385-20 Type III extension ladder with a 200-pound load capacity from Westlake Ace Hardware in Shawnee, Kansas. More than eighteen years later, on July 22, 2010, plaintiff was using this

ladder to clean out her gutters and look at her roof.  Plaintiff alleges that, while she was on the ladder, approximately four feet off the ground, the extension locking hooks falsely locked, causing the ladder to fully collapse while plaintiff was on it.  As a result, plaintiff claims that she slid down the ladder, got caught between its rungs, and ultimately fell to the ground with the ladder coming down on top of her.  Plaintiff initially alleged that she suffered physical injuries to her wrist, knee, and heel, as well as a severe traumatic head injury.  During the pretrial conference, however, plaintiff withdrew her claim of a severe traumatic head injury and instead asserted that she suffers from psychological and psychiatric issues as a result of the incident.

It is these psychological and psychiatric issues that are the primary focus of defendant's motion for partial summary judgment.  Plaintiff owns her own advertising services business, Tracy Thomas Advertising.  She writes, produces, and provides the voice for advertising spots, sells radio spots to clients, provides creative and production supervision services, and assists clients with the actual production of creative material.  Plaintiff now alleges that, as a result of her psychological brain trauma, her creative ability is not as effective as it was before the accident, thereby causing her to lose all of her "major advertising clients, with none on the horizon."  Dkt. 50-2, at 6.  Specifically, plaintiff identifies the following businesses as "lost clients:" (1) Clockwork Home Services, (2) Pyramid Roofing, (3) Axcet HR Solutions, (4) Bordner Roofing, and (5) Elder & Disability Law Firm.

On July 13, 2012, plaintiff filed suit against defendants Louisville Ladder, Inc., Westlake Hardware, Inc., and Ace Hardware Group in the district court of Johnson County, Kansas, case number 12CV5630, alleging negligence, manufacturing defect, failure to warn, design defect, and breach of implied warranty of merchantability for which she seeks, *inter alia*, damages for lost profits.  Dkt. 1-1.  On April 25, 2013, plaintiff voluntarily dismissed without prejudice

defendants Westlake and Ace.  Dkt. 1-2.  On May 23, 2013, defendant removed plaintiff's action

to the United States District Court, District of Kansas citing jurisdiction based on diversity of

citizenship pursuant to 28 U.S.C. § 1332 (Dkt. 1).  Defendant now seeks partial summary

judgment on plaintiff's claim of lost profits.

## II.   Legal Standard for Summary Judgment

Summary judgment is appropriate if the moving party demonstrates that there is no

genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.

FED. R. CIV. P. 56(a).  A fact is "material" when it is essential to the claim, and the issues of fact

are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either

party's favor.  *Haynes v. Level 3 Communs.*, 456 F.3d 1215, 1219 (10th Cir. 2006).  The movant

bears the initial burden of proof and must show the lack of evidence on an essential element of

the claim.  *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2004) (citing *Celotex

Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).  The nonmovant must then bring forth specific

facts showing a genuine issue for trial.  *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir.

2005).  These facts must be clearly identified through affidavits, deposition transcripts, or

incorporated exhibits – conclusory allegations alone cannot survive a motion for summary

judgment.  *Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197 (10th Cir. 2000) (citing *Adler

v. Wal-Mart Stores*, 144 F.3d 664, 670 (10th Cir. 1998)).  The court views all evidence and

reasonable inferences in the light most favorable to the non-moving party.  *LifeWise Master

Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

## III.   Analysis

Plaintiff alleges that not only did she suffer physical bodily harm as a result of the ladder

incident, but also that she suffered psychological and psychiatric issues which now prevent her

from effectively operating her advertising business.  As a result, plaintiff alleges that she is entitled to damages for lost profits.  Defendant contends that plaintiff cannot prove her claim of lost profits and therefore moves for partial summary judgment on the matter.  As per the Pretrial Order, Kansas law will govern the substantive issues in this case.  Dkt. 48, at 2.

A.    **Lost Profits**

Under Kansas law, "[t]he generally accepted rule is that, where it is shown that a loss of profits is the *natural and probable consequence* of the act or omission complained of, and their amount is shown with *reasonable or sufficient certainty*, there may be a recovery therefor." *Bradley v. Aid Ins. Co.*, 6 Kan. App. 2d 367, 376 (Kan. Ct. App. 1981) (citing 25 C.J.S., Damages § 42, 735-36) (emphasis added).   "There is no hard and fast rule with respect to the recovery of lost profits, and each case depends on its facts and circumstances; *therefore, each case must be examined to whether, under its particular facts, the profits involved are capable of reasonable ascertainment.*"  *Id*. (emphasis in original).

1.    **Natural and Probable Consequence**

Plaintiff argues that, following the incident, she lost five major clients: (1) Clockwork Home Services, (2) Pyramid Roofing, (3) Axcet HR Solutions, (4) Bordner Roofing, and (5) Elder & Disability Law Firm.  She also alleges that she has no prospects of major advertising clients on the horizon.  Defendant counters, however, that plaintiff is unable to show that the loss of these clients, if there even was a loss, was a result of the incident.  In response, plaintiff argues that her testimony and tax returns from both before and after the incident support a finding that her loss of profits was a "natural and probable consequence" of the incident.   The court disagrees.

### a.    Clockwork Home Services

According to plaintiff, she first acquired Clockwork Home Services ("Clockwork") as a client in 2009 when she was contracted by its then-owner, John Young ("Young"). Dkt. 57, at 3. In the summer of 2010, after the incident, Young sold Clockwork to a company by the name of Direct Energy. Dkt. 50-1, at 12. Plaintiff worked with Clockwork right up until it was sold, even while she was in a nursing home recovering from the injuries she sustained in the incident. Dkt. 50-1, at 12. However, she did not continue working with Clockwork when it fell under new ownership. Dkt. 50-1, at 12. Plaintiff alleges that she was not allowed to make a pitch to Direct Energy to continue the account. Dkt. 50-1, at 13. When asked by defense counsel why she was denied this opportunity, plaintiff testified, "I don't know. I believe certain things, but I don't know . . . I believe that because of my brain injury, my creative was not as effective, so I was not introduced to the new buyers." Dkt. 50-1, at 13. However, when asked if anyone ever *told* her that she did not get the account because her work was not as good as it was before the incident, plaintiff responded "no." Dkt. 50-1, at 15.[1]

### b.    Pyramid Roofing

Plaintiff testified that she last did work for Pyramid Roofing ("Pyramid") in 2011, well after the incident. Dkt. 50-1, at 27. Pyramid ran a radio advertisement in 2012 which was placed through plaintiff but used the creative work from another individual. Dkt. 50-1, at 27. Plaintiff claims that when she asked the company why it went with another individual's creative, someone from Pyramid told her, "I just don't think your copy's working as well." Dkt. 50-1, at 27. However, when defense counsel asked "[a]nd so to your understanding, have they [Pyramid]

---

[1] Plaintiff also alleges that Young did not allow her to pitch for his local business, Picasso's Exotic Fish. Dkt. 50-1, at 15. However, plaintiff testified that when she asked Young why she was not given the opportunity to pitch, he simply did not reply. Dkt. 50-1, at 16.

fired you or are they just in a holding pattern," plaintiff responded "[t]hey're in a holding pattern."  Dkt. 50-1, at 26.  And when asked if anyone from Pyramid ever told her that they were no longer working with her because she could not do the work, plaintiff responded "no."  Dkt. 50-1, at 26.  Plaintiff also testified that Pyramid told her that "if it hails, they will come back."  Dkt. 50-1, at 26.

### c.      Axcet HR Solutions

Plaintiff testified that the last time she worked for Axcet HR Solutions ("Axcet") was in 2009, well before the incident.  Dkt. 50-1, at 29.  She claims that she was invited to make a pitch to the company in 2011 but was not awarded the contract.  Dkt. 50-1, at 29.  When plaintiff inquired why, she testified that the company told her it was "just not as comfortable with [her] approach, so [it was] not going to buy any advertising from [her], and [it] went with someone else."  Dkt. 50-1, at 29.  According to plaintiff, Axcet commented that that her approach was "[a] little too direct or abrasive or angry or not smooth, something like that.  Just not [its] style."  Dkt. 50-1, at 30.  In her Opposition, plaintiff expresses disbelief at this explanation, since Axcet allegedly liked her style in 2009 before the incident.  Dkt. 57, at 7.

### d.      Bordner Roofing

In her Complaint, plaintiff identified Bordner Roofing ("Bordner") as a lost client.  However, she testified that she *voluntarily* dropped Bordner because she accepted the contract with Pyramid and could not do both as it created a conflict of interest.  Dkt. 50-1, at 30-31.  She also testified that she did not go back to Bordner once her work with Pyramid entered the "holding pattern."  Dkt. 50-1, at 31.  In her Opposition, plaintiff stated that "[e]ven though a conflict no longer exist[ed] once [she] lost Pyramid roofing as a client, she *would have been unable to reacquire Bordner Roofing* had she pursued them."  Dkt. 57, at 8 (emphasis added).

However, plaintiff's only justification for this belief is that her "injury interferes with her ability to pursue new business or reacquire old business" because "[a]s a result of [her] psychological brain trauma, her creative ability was not as effective as it was before the incident and because of that, she was not introduced to new clients, resulting in lost income." Dkt. 57, at 8.

### e.   Elder & Family Law Firm

Finally, plaintiff testified that the Elder & Family Law Firm ("the Firm") had been a client of hers for the past four or five years. Dkt. 50-1, at 28. In fact, plaintiff had done work continuously for the Firm until the summer of 2013. Dkt. 57, at 9. Plaintiff testified that, after a month of advertising in 2013, the Firm contacted her, stated that it no longer liked her copy, and terminated its contract with no notice. Dkt. 50-1, at 28. Plaintiff, however, admitted that the Firm made no other comment as to why it was pulling the copy, and that the Firm did not actually move to another advertising agency; rather, it was simply refraining from advertising and "just not running [its] spots." Dkt. 50-1, at 28. She also admitted that the Firm never indicated that it would not eventually come back to plaintiff for its advertising needs. Dkt. 50-1, at 28.

### f.   Plaintiff's Tax Returns

Plaintiff further alleges that her tax returns from the years before and after the incident provide proof that her loss of profits is a direct result of the incident. Plaintiff's tax records reveal the following:

| Tax Year | Adjusted Gross Income |
|----------|----------------------|
| 2006 | $46,876 |
| 2007 | $37,118 |
| 2008 | $2,696 |
| 2009 | $81,864 |
| 2010 | $34,995 |
| 2011 | $36,465 |
| 2012 | -$6,871 |

Dkts. 56-2-8.  While plaintiff suffered a loss in 2012, there is absolutely no evidence in the record that explains *why* she suffered that loss.  It is clear that her income varied, sometimes dramatically, from year to year.  For example, between 2007 and 2008, more than two years before the incident, plaintiff suffered what appears to be a $34,422 decrease.  And then between 2008 and 2009, her income increased drastically by nearly $80,000.  Furthermore, plaintiff's income actually increased in 2011, the year immediately following the incident.  But, while these numbers are helpful to put in perspective plaintiff's earnings, the numbers themselves still fail to explain *why* plaintiff experienced a decrease in income in 2012 and they certainly do not show that the loss was a "natural and probable consequence" of the incident.

Therefore, based on a review of the record, the court finds that plaintiff is unable to satisfy the first requirement of a loss of profits claim; that is, she is unable to prove that her loss of profits was a "natural and probable consequence" of the incident. Of the five allegedly "lost clients" identified by plaintiff, two (Pyramid and the Firm) are simply currently not advertising, one (Axcet) ceased working with plaintiff in 2009, before the incident, one (Clockwork) was sold to a new owner who chose not to retain plaintiff, and one (Bordner) was voluntarily surrendered by plaintiff because it created a conflict of interest.  Plaintiff offers absolutely no evidence, other than her own speculation, that she "lost" these clients because of psychological injuries allegedly sustained in the incident.  Plaintiff admitted that she lost clients and/or failed to gain clients *before* the incident, as well.  Dkt. 50-1, at 17.  Moreover, she also admitted that, as of the time of her deposition, February 12, 2014, she had already received four calls for advertising and secured two clients since the beginning of 2014.  Dkt. 56-1, at 35-36.  Plaintiff's tax returns also fail to support her claim, as her annual adjusted gross income often varied wildly even before the incident.

In resisting a motion for summary judgment, "the nonmoving party must come forward with specific facts showing the presence of a *genuine* issue of material fact for trial and *significant probative* evidence supporting the allegation." *Burton v. Blue Cross & Blue Shield of Kan. City*, 2014 U.S. Dist. LEXIS 104328, at *2 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) (emphasis added)). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmoving party "cannot rely on ignorance of facts, *on speculation, or on suspicion*, and may not escape summary judgment in the mere hope that something will turn up at trial." *Hartford Fire Ins. Co. v. Vita Craft Corp.*, 911 F. Supp. 2d 1164, 1168 (D. Kan. 2012) (quoting *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988) (emphasis added)). Here, plaintiff merely speculates that she "lost" these clients and failed to gain new ones because of the psychological injuries allegedly sustained in the incident. This speculation is simply not enough to withstand a motion for summary judgment. Therefore, defendant's motion for partial summary judgment on the issue of loss of profits is granted.

### 2.      Reasonable Amount of Sufficient Certainty

Even if plaintiff was able to satisfy the first requirement of her loss of profits claim, she also fails to prove her losses "with reasonable or sufficient certainty." *Bradley*, 629 P.2d at 727. The Kansas Supreme Court has held the following when it comes to proving losses with reasonable or sufficient certainty:

> Unquestionably, a method of establishing a loss of profits with reasonable certainty is by showing a history of past profitability. Past profitability of a particular business is not, however, the only method of proving lost future profits. The evidence necessary in establishing lost future profits with reasonable certainty must depend in a large measure upon the circumstances of the particular case. Absolute certainty in proving loss of future profits is not required. What is required is that the court or jury be guided by some rational standard. As to evidentiary matters a court should approach each case in an individual and

pragmatic manner, and require the claimant furnish the best available proof as to the amount of loss that the particular situation admits.

*Vickers v. Wichita State Univ.*, 213 Kan. 614, 620 (Kan. 1974) (internal citations omitted).

Here, plaintiff relies upon the conclusions of her expert, Jeff S. Hanson ("Hanson"), a certified public accountant, to show her loss of profits with "reasonable certainty."  Hanson opined that, based on plaintiff's tax returns from 2005 through 2012, plaintiff's expected loss of profits from the date of the incident through various possible retirement ages in the years 2013, 2015, and 2017 is as follows: (1) $107,000 (age 65), (2) $158,000 (age 67), and (3) $188,000 (age 69).  Dkt. 56-9, at 3.  In reaching this conclusion, Hanson used the discounted cash flow method.

In both its motion for partial summary judgment and motion to exclude/strike, defendant argues that Hanson's conclusions "are based on an improper assumption that Plaintiff's loss of business is a result of the injuries allegedly suffered in the Incident."  Dkt. 59, at 6; Dkt. 50, at 5-7.  Whether this is true is irrelevant to the court's current analysis, which is showing that, *even if plaintiff could show causation*, she cannot prove damages with "reasonable certainty."  In other words, for the very limited purpose of this analysis, the court is presuming causation.

Even presuming causation, Hanson's report still fails to convince the court of the "reasonable certainty" of plaintiff's loss of profits.  Hanson states that his conclusions are based on, *inter alia*: (1) plaintiff's tax returns from 2005 through 2012, (2) plaintiff's written responses to a financial information request, (3) plaintiff's written interrogatory responses in this case, and (4) discussions with plaintiff.  Dkt. 56-9, at 8.  There is no discussion in the report that Hanson considered the fact that, even now, after she has reached age 65, plaintiff continues to work and is building her business.  Dkt. 56-1, at 30-31.  In fact, plaintiff testified that she actively sought clients as recently as early 2014.  Dkt. 50-1, at 17-18.  Nor does the report seem to take into

account the fact that plaintiff is still taking clients, including one that has a working budget of $12,000 per month.  Dkt. 50-1, at 20.  Furthermore, because the report presumes causation, it presumes that *all* loss of profits is attributable to the incident.  However, plaintiff herself testified that she voluntarily relinquished at least one account (Bordner) because of a conflict of interest.  Dkt. 50-1, at 30-31.  The report seemingly fails to take into account reasons for a loss of profit *other* than the incident, for example, plaintiff's chess board sales business and chess-related volunteer project.[2]

Based on its review of Hanson's report, the court finds it to be too speculative and based entirely on the incident rather than on a more complete picture of plaintiff's current financial situation.  As such, the court finds that, *even if* plaintiff could prove causation (which it previously determined she could not), she fails to prove her loss of profits with "reasonable certainty" based on the "circumstances of [her] particular case."  *Vickers*, 213 Kan. at 620.  Therefore, defendant's motion for partial summary judgment on the issue of loss of profits is granted.

The court additionally notes that Hanson's testimony and report is only relevant to proving plaintiff's loss of profits claim.  Since the court finds that plaintiff fails to maintain this claim, Hanson's testimony and report are irrelevant.  As such, defendant's motion to exclude/strike the report and testimony of Hanson is dismissed as moot.

---

[2] Plaintiff testified that, in October 2012, she decided to start a new side business selling custom-made chess boards and pieces.  Dkt. 50-1, at 6-7.  She indicated that she pursued this business as recently as of the date of her deposition in February 2014.  Dkt. 50-7, at 7.  Plaintiff also stated that she began volunteering to coordinate chess tournaments in low- and middle-income public schools in Kansas City, Missouri.  Dkt. 50-1, at 33.  As part of this volunteer effort, plaintiff worked on, submitted, and presented a grant application for funding.  Dkt. 50-1, at 33.  As part of the grant program, plaintiff proposed organizing seven tournaments.  Dkt. 50-1, at 33.  Plaintiff turned down this opportunity after the funding authority only granted her $45,000 of the $150,000 requested.  Dkt. 50-1, at 33.

**IT IS THEREFORE ORDERED** this 20th day of October, 2014, that defendant's motion for partial summary judgment (Dkt. 51) is hereby granted.  As such, defendant's motion to exclude and/or strike (Dkt. 49) is dismissed as moot.

s/J. Thomas Marten
J. THOMAS MARTEN, CHIEF JUDGE